# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | Martin C. Ashman |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2021 | **DATE** | 4/20/2001 |
| **CASE TITLE** | Reverend Stephen Tracy Anderson vs. Matthew F. Hale, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]    Enter memorandum opinion and order. Plaintiff's motion to compel [36-1] is granted in part and denied in part, and plaintiff's motion for a protective order [36-2] is granted.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | **5** number of notices | |
| ✓ | Notices mailed by judge's staff. | APR 2 3 2001 date docketed | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | 4/20/2001 date mailed notice | |
| ✓ | Copy to judge/magistrate judge. | | |

| IS | courtroom deputy's initials | FILED FOR DOCKETING 01 APR 20 PM 4:49 | Date/time received in central Clerk's Office | IS mailing deputy initials |
|---|---|---|---|---|

Document Number

50

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| REVEREND STEPHEN TRACY ANDERSON, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 00 C 2021 |
| v. | ) ) | Judge James B. Moran |
| MATTHEW F. HALE; THE WORLD CHURCH OF THE CREATOR, an unincorporated association; THE ESTATE OF BENJAMIN NATHANIEL SMITH, | ) ) ) ) ) ) | Magistrate Judge Martin C. Ashman |
| Defendants. | ) ) | |

**DOCKETED**

**APR 2 3 2001**

## MEMORANDUM OPINION AND ORDER

Plaintiff, Reverend Stephen Tracy Anderson, filed a complaint against Defendants, Matthew F. Hale, The World Church of the Creator (the "WCOTC"), and the Estate of Benjamin Nathaniel Smith, seeking relief under various federal and state laws for violating his rights by physically injuring him. The complaint arose out of Smith's widely publicized July 1999 shooting spree and its connection, as alleged by Plaintiff, to Hale and the WCOTC. Presently before this Court are Plaintiff's Motion to Compel and Motion for a Protective Order.[1] The motions

---

[1] While Defendants filed their Consolidated Memorandum in Opposition to Plaintiff's Motion to Compel and for a Protective Order late without leave of court, this Court, sua sponte, grants Defendants an extension of time nunc pro tunc as of March 5, 2001. However, this Court will not overlook Defendants' transgression of Standing Order II.(3), which limits briefs to fifteen pages. Accordingly, Defendants' brief ends at page fifteen. *See* Standing Order at II.(3) (citing Local R. 9(d)).

50

pertain to surreptitious tape recordings made by Defendants' counsel, who has been admitted pro hac vice to practice before this Court. For the reasons that follow, Plaintiff's Motion to Compel is granted in part and denied in part, and Plaintiff's Motion for a Protective Order is granted.

## I.  Background

On October 13, 2000, Defendants' counsel's telephone rang. To Defendant's counsel's apparent pleasure, Kenneth Dippold, one of Plaintiff's witnesses, was on the line. Dippold voluntarily called Defendants' counsel in New York from a location in Illinois to answer any questions regarding Dippold's involvement in the underlying litigation. Dippold had received a subpoena from Defendants' counsel earlier that day.

Defendants' counsel served the subpoena on Dippold immediately upon discovering his identity on October 7, 2000. At that time, Plaintiff identified Dippold as the sole witness to support the allegation that Hale encouraged Smith to engage in the July 1999 shooting spree. Before that date, Plaintiff had not identified a witness to support this allegation.

Seizing the opportunity, Defendants' counsel hit the record button and commenced surreptitiously taping the conversation with Dippold. The conversation lasted for some time, covering in detail Dippold's contacts with Hale, the WCOTC, and various other parties having an interest in the underlying litigation. Dippold never asked if Defendants' counsel was taping the conversation.

Nor did Defendants' counsel make any representations to Dippold suggesting that the conversation was or was not being taped.

The existence of the tape remained undiscovered by Dippold and Plaintiff until Dippold's deposition approximately two months later. After three hours of questioning, and allegedly a few too many inconsistent statements, Defendants' counsel revealed that the October telephone conversation was surreptitiously taped. Because Defendants' counsel proceeded to use a transcript of the tape to impeach Dippold, Defendants' counsel immediately provided Plaintiff's counsel with a copy of the tape. Any work-product protection no longer applied.

Approximately one month later, Plaintiff discovered the existence of another tape. This tape pertained to a conversation between Defendants' counsel and Ian Sigel, another witness in the case. Similar to the circumstances surrounding Dippold's tape, Sigel was in Illinois at the time of the telephone conversation, while Defendants' counsel was in New York. Sigel had also received a subpoena from Defendants' counsel.

In view of Defendants' counsel's tactics, Plaintiff served a Fourth Request for the Production of Documents and Things on Defendant. Among other things, Plaintiff requested "any and all audio tapes and/or written transcripts reflecting any conversation(s) between [Defendants] and/or [Defendants'] attorney(s) and any third-party referring or relating to the [underlying lawsuit]." (Pl.'s Consolidated Mem. Supp. Mot. Compel & Protective Order at 4.) Days later Defendants

responded, asserting the work product doctrine and refusing to produce any tapes.

At a status hearing before Judge Moran on January 23, 2001, Plaintiff again demanded production of the Sigel tape and Defendants again asserted that the tape was not discoverable because of the work product doctrine. After some discussion, however, Defendant agreed to produce the Sigel tape in exchange for certain documents possessed by Plaintiff. Although both parties believed that no other tapes existed, Plaintiff proffered that the parties brief the applicability of the work product doctrine to Defendants' counsel's surreptitious recordings at a later date if necessary. Nothing more was said on the issue.

As it turned out, Plaintiff quickly determined that it was necessary to brief the issue. More tapes, in fact, existed. Moreover, Defendants' counsel refused to discontinue making additional tapes. With deposition dates approaching and the threat of damning impeachment hovering, the instant motions ensued.

## II.  <u>Discussion</u>

### A.   **Judge Moran's Status Hearing on January 23, 2001**

Initially we briefly address Defendants' contention that Plaintiff's instant request for relief is moot because of Judge Moran's "ruling" on January 23, 2001. We find the argument totally unconvincing.

Defendants' argument requires us to consider the following: Plaintiff's January 22, 2001 status report and an agreement reached in court between Plaintiff and Defendants the next day. In the status report, Plaintiff informed Judge Moran about Defendants' counsel's surreptitious taping of conversations with witnesses. After outlining the parties' respective positions on the issue, Plaintiff requested specific relief, assuming that Judge Moran found Defendants' counsel's conduct illegal or unethical. (Greenwald Decl. Ex. D.)

The parties presented their general positions on the issue to Judge Moran at the status hearing on January 23, 2001. Importantly, the parties did not submit briefs on the issue, and, at the time, both parties were under the mistaken belief that only the Sigel tape remained undisclosed to Plaintiff.

After various exchanges, Judge Moran interjected and narrowed the discussion to the specific issue of the Sigel tape. To get past the issue, Judge Moran suggested that Defendants deliver the tape in exchange for certain notes possessed by Plaintiff. The parties agreed.

Before leaving, however, the parties generally discussed again the applicability of the work product doctrine to Defendants' counsel's surreptitious recording of witnesses. Some viewpoints were presented. Some observations were made. But nothing definitive transpired. Plaintiff ended the discussion by stating that briefing may become necessary on the issue. (*See* Tr. Oral Argument 1/23/01, at 28-29.)

Our reading of the transcript reveals nothing more. Defendants reading, on the other hand, produces the following: "Judge Moran[] conclu[ded] that there was nothing illegal about [Defendants' counsel's surreptitious taping of witnesses], and [Judge Moran] refus[ed] to order that 'all tape recorded conversations' be produced, or that Defendants' counsel be prohibited in the future from tape recording conversations with witnesses . . . ." (Defs.' Consolidated Mem. Opp'n Pl.'s Mot. Compel & Protective Order at 9-10.) We discern that the argument goes something like this: Judge Moran was sufficiently informed about the issues as per Plaintiff's status report and Defendants only produced the Sigel tape after the hearing; therefore, Plaintiff's other requested relief must have been denied.

As we stated in open court, this argument is outrageous. (Tr. Oral Argument 3/13/01, at 20.) An additional read of Defendants' brief, and the portentous contentions contained therein, affirms the statement.

The dialogue before Judge Moran at the status hearing is best characterized as a settlement discussion relating to the Sigel tape. After the parties provided Judge Moran with the big picture for the first time, Judge Moran quickly narrowed the discussion and concentrated on the dispute regarding the Sigel tape--the only known tape in existence at that time.

To settle the dispute, and avoid any briefing on the complicated issues presented, Judge Moran suggested that the parties exchange certain information. The parties agreed. True,

additional conversation led to the disclosure of some preliminary observations regarding the legality and ethics of surreptitious taping, but this is all they were, observations.[2]  A judicial decision on these issues was never made.  Indeed, this is precisely why Plaintiff suggested that the issues may need to be briefed.

### B.    Assertion of Work-Product Doctrine

The remaining initiatory matter -- whether Defendants timely and properly asserted the work-product doctrine as a basis for withholding disclosure of the tapes -- can be ruled on almost as easily as the first.  As Plaintiff correctly points out, the protection afforded by the work-product doctrine is not self-executing.  *See Marx v. Kelly, Hart & Hallman, P.C.*, 929 F.2d 8, 12 (1st Cir. 1991); *Applied Sys., Inc. v. N. Ins. Co. of N.Y.*, No. 97 C 1565, 1997 WL 639235, at *2-3 (N.D. Ill. 1997). Instead, parties asserting an objection to discovery on the ground of work-product doctrine must present that objection in a timely and proper manner as defined by the Rules.  *See Peat*

---

[2]    In response to the parties' arguments regarding the applicability of the Illinois eavesdropping statute to this case, Judge Moran stated, "I think the recording is where the machine is."  Similarly, in response to Plaintiff's argument regarding the ethical implications of surreptitiously taping witnesses in Illinois, Judge Moran stated, "I don't know about that."  (Tr. Oral Argument 1/22/01, at 29.)  These observations can hardly be described as rulings.

*Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir. 1984).

Rule 34(b) provides that parties served with a document request must respond within thirty days after service of the request; and, if any request is objected to, the reason for the objection must be stated. Additionally, Rule 26(b)(5) requires the objecting party to expressly make the claim of privilege and "describe the nature of the documents, communications, or things not produced . . . in a manner that, without revealing information itself privileged or protected, will enable [the] other part[y] to assess the applicability of the privilege or protection."

Failure to follow these Rules may result in waiver of work-product protection. *See Marx*, 929 F.2d at 12; *Applied Sys., Inc.*, 1997 WL 639235, at *2-3; *Smith v. Conway Org.*, 154 F.R.D. 73, 76 (S.D.N.Y. 1994); 8 Charles Alan Wright et al., Federal Practice and Procedure § 2016.1, at 228-29 (2d ed. 1994). Although this result is not mandated by the Rules, the Advisory Committee contemplated the sanction. "To withhold materials without [providing notice as described in Rule 26(b)(5)] is contrary to the rule, subjects the party to sanctions under Rule 37(b)(2), and may be viewed as a waiver of the privilege . . . ." Fed. R. Civ. P. 26(b)(5) advisory committee's note (1993).

Acknowledging the harshness of a waiver sanction, courts have reserved the sanction for those cases where the offending

party committed unjustified delay in responding to discovery. Minor procedural violations, good faith attempts at compliance, and other such mitigating circumstances militate against finding waiver. *See First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 902 F. Supp. 1356, 1361-63 (D. Kan. 1995) (collecting cases). In contrast, evidence of foot-dragging or a cavalier attitude towards adhering to court orders and the discovery rules supports finding waiver. *See Marx*, 929 F.2d at 12; *Applied Sys., Inc.*, 1997 WL 639235, at *2-3. In the end, the determination of waiver must be made on a case-by-case basis.

To find waiver here, we would have to apply Rules 34(b) and 26(b)(5) in an overly formalistic and technical manner. The sanction would not only be unduly harsh, but it would also impinge on the spirit and purpose of the Rules.

It cannot be argued that Plaintiff knew of Defendants' intent to assert work-product protection before January 22, 2001 -- well within the thirty day limit of Rule 34(b). Surely, the information in Plaintiff's January 22, 2001 status report reveals this. Plaintiff himself spells out the possible legal and ethical problems associated with Defendants' counsel's surreptitious recordings and at least touches on the effect that Defendants' counsel's conduct may have on work-product protection. In fact, the letter indicates that "Defendants' counsel [told Plaintiff] that [he] will claim a work product privilege over [the] tape recordings and transcriptions." (Greenwald Decl. Ex. D at 2.) In any event, even setting aside

the letter, Defendants' assertion of work-product protection at the first available opportunity in court on January 23, 2001, certainly precludes the harsh sanction of waiver.

In no way do we suggest that Defendants' method -- whichever one of the two is considered -- of apprising Plaintiff of the basis for withholding the tapes constitutes perfect compliance under the Rules. But an express claim of work-product protection was made (actually within a shorter time than required), the basis for that claim was sufficiently articulated to put Plaintiff on notice, and Plaintiff suffered no prejudice by the way in which Defendant communicated the information. For those reasons, Defendants' good faith compliance with the Rules precludes a finding of waiver.

### C.    Work-Product Doctrine

That brings us to the substance of the instant dispute. Defendants contend that any tapes they possess are protected by the work-product doctrine and therefore need not be produced. Plaintiff questions the applicability of the doctrine to the tapes, and argues that, even if work-product protection applies, it has been vitiated by Defendants' counsel's unethical conduct in procuring the tapes. These arguments are addressed below.

## 1.   Purpose of the Work-Product Doctrine

The work-product doctrine strikes a balance between the benefits of an adversary system and liberal discovery rules.  *See Upjohn Co. v. United States*, 449 U.S. 383, 397-403 (1981); *Hickman v. Taylor*, 329 U.S. 495, 507-12 (1947).  On the one hand, liberal discovery rules provide parties with the fullest possible knowledge of the operative facts of the case before trial to reduce surprise and ensure that cases are decided on the merits. *See Hickman*, 329 U.S. at 507; *Onwuka v. Fed. Express Corp.*, 178 F.R.D. 508, 516 (D. Minn. 1997).  On the other hand, to arrive at the truth, the adversary system pits attorneys against each other and charges them with gathering information, sifting through it, and developing strategy.

Taken to the extreme, full disclosure could discourage good lawyering.  Attorneys would have little incentive to gather information and develop strategy if everything they wrote down would have to be disclosed.  Some attorneys would simply "borrow the wits of another."  *See Hickman*, 329 U.S. at 516.  Or "unfair[] and sharp practices" would "inevitably develop in the giving of legal advice and in the preparation of cases for trial."  *Id*. at 511.  In the end, "the cause of justice would be poorly served."  *Id*.

To protect against this, the Supreme Court created the work-product doctrine.  It creates a "certain degree of privacy"

protected from the broad scope of discovery[3] to maintain balance and fairness in adversarial competition. *See id.* at 510-11.

## 2. Requirements of the Work-Product Doctrine

Rule 26(b)(3), for the most part, represents *Hickman* and its progeny in codified form. Gathering from these cases, the Rule poses three tests that must be satisfied for work-product protection to apply. First, the material sought must constitute "documents and tangible things." Second, the material must have been "prepared in anticipation of litigation or for trial." Third, the material must have been prepared "by or for another party or by or for that other party's representative." Fed. R. Civ. P. 26(b)(3).

In this case, Defendants' tapes fall within this broad definition. *See Ward v. Maritz, Inc.*, 156 F.R.D. 592, 597 (D.N.J. 1994); *Jones v. Ada S. McKinley Cmty. Servs.*, No. 89 C 0319, 1989 WL 152352, at *2-3 (N.D. Ill. Nov. 28, 1989); *Haigh v. Matsushita Elec. Corp. of Am.*, 676 F. Supp. 1332, 1357 (E.D. Va. 1987). The tapes are consumed under the nebulous definition of "tangible things," and the circumstances surrounding the tapes reveal that Defendants' counsel prepared the tapes in anticipation of litigation. All of the tapes were created after

---

[3] In *Upjohn*, the Supreme Court elaborated on this zone of privacy, defining its limits based on the content of information sought and the need for that information. 449 U.S. at 397-402.

Plaintiff filed the complaint, and all of the tapes involve witnesses in the underlying litigation.

### 3. Vitiation of the Work-Product Doctrine

But our analysis does not end there. Unethical conduct, which is alleged by Plaintiff in his motion, vitiates the protection otherwise afforded under the work-product doctrine. *See Parrott v. Wilson*, 707 F.2d 1262, 1271-72 (11th Cir. 1983); *Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981); *Blanchard v. Edgemark Fin. Corp.*, 192 F.R.D. 233, 241 (N.D. Ill. 2000); *Jones*, 1989 WL 152352, at *3.

This exception arises by necessary implication from the *Hickman* decision. *See Moody*, 654 F.2d at 800; *Otto v. Box U.S.A. Group, Inc.*, 177 F.R.D. 698, 700-01 (N.D. Ga. 1997); G. Michael Halfenger, *The Attorney Misconduct Exception to the Work Product Doctrine*, 58 U. Chi. L. Rev. 1079, 1090 (1991). In creating the work-product doctrine, the *Hickman* Court only concerned itself with protecting the fact gathering and strategy planning of officers of the court working for the advancement of justice in the course of their legal duties. *See Hickman*, 329 U.S. at 510. Certainly this could only include ethical conduct.

Further support for the exception derives from the purpose of the work-product doctrine itself. As discussed above, the *Hickman* Court created the work-product doctrine to protect the

integrity of the adversarial system by guarding against the "unfair[] and sharp practices" that would inevitably develop in the doctrine's absence. *Id.* at 511. Such practices, the *Hickman* Court concluded, would have a demoralizing effect on the legal profession and poorly serve "the cause of justice." *Id.* The *Moody* court puts the point most clearly: "It would indeed be perverse . . . to allow a lawyer to claim an evidentiary privilege to prevent disclosure of work product generated by [unethical conduct]" when this is the type of conduct that the work-product doctrine aims to prevent. *Moody*, 654 F.2d at 800.

With this in mind, we turn to Plaintiff's allegations of unethical conduct. Each is addressed separately below.

### a. Local Rule 83.58.4(a)(4)

Plaintiff first contends that work-product protection has been vitiated by Defendants' counsel's violation of Local Rule 83.58.4(a)(4). Local Rule 83.58.4(a)(4), which mirrors Model Rule of Professional Conduct 8.4(c), prohibits an attorney from engaging in conduct that involves "dishonesty, fraud, deceit or misrepresentation." It is a general statement of proscribed behavior, encompassing more specific rules but also filling the gaps between those more specific rules.

Here, Plaintiff argues that Defendants' counsel's recording of conversations with witnesses without their consent constitutes a clear violation of the Rule, regardless of the fact that there

is no evidence of affirmative misrepresentation. The mere failure to inform, Plaintiff contends, is enough to transgress the Rule.

Defendants disagree, insisting that tape recording conversations with witnesses without their consent is completely ethical and proper. Moreover, in situations such as the one presented here, Defendants argue, where a case depends largely on the credibility of a witness who has made serious and damaging accusations, surreptitiously taping witnesses is crucial to uncover the truth.

In 1974 the American Bar Association concluded that attorneys should not "record any conversation whether by tapes or other electronic device . . . without the consent or prior knowledge of all parties to the conversation" because such conduct is deceitful. ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 337 (1974). The ABA based this conclusion on notions of candor and fairness, emphasizing the unique position held by attorneys in the legal system. *See Sea-Roy Corp. v. Sunbelt Equip. & Rentals, Inc.*, 172 F.R.D. 179, 182-83 (M.D.N.C. 1997); ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 337 (citing ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 1009 (1967) (taping conversations with other lawyers); ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. 1008 (1967) (taping conversations with clients); ABA Comm. on Ethics and Prof'l Responsibility, Informal Op. C-480 (1961) (taping conversations in court); and

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 150
(1936) (prosecutor's use of taped conversations between defense
attorney and client)).  Ample state ethical opinions at the time
also supported the decision.  *See* ABA Comm. on Ethics and Prof'l
Responsibility, Formal Op. 337.

Plaintiff asks us to reaffirm this position, offering
extensive recent support to guide us.  Apparently every federal
case to address the surreptitious taping issue presented here has
relied on ABA Formal Opinion 337 in some way to find the conduct
unethical.  *See Chapman & Cole v. Itel Container Int'l B.V.*, 856
F.2d 676, 686 (5th Cir. 1989); *Parrott*, 707 F.2d at 1271-72;
*Northfield Ins. Co. v. George E. Buisson Realty Co.*, No. CIV. A.
99-151, 1999 WL 804076, at *2 (E.D. La. Oct. 7, 1999); *Otto*, 177
F.R.D. at 699-701;  *Sea-Roy Corp.*, 172 F.R.D. at 182-84; *Ward*,
156 F.R.D. at 597-98; *Bogan v. Northwestern Mut. Life Ins. Co.*,
144 F.R.D. 51, 56 (S.D.N.Y. 1992); *Wilson v. Lamb*, 125 F.R.D.
142, 143-44 (E.D. Ky. 1989); *Haigh*, 676 F. Supp. at 1357-58; *In
re Hunter Studios, Inc.*, 164 B.R. 431, 438-39 (Bankr. E.D.N.Y.
1994).  Also, a majority of state bar associations still follow
ABA Formal Opinion 337.  *See* Utah State Bar Ethics Advisory Op.
Comm., Op. 96-04 (1996).  Finally, a review of secondary
literature reveals approval for the ABA's position.  *See*
Stanley S. Arkin, *Attorneys, Tape Recorders and Perfidy*,

N.Y.L.J., Apr. 14, 1994, at 3; Seth M. Schwartz, *Taping Telephone Calls: It's Legal, but Is It Ethical?*, N.Y. St. Bar J., Feb. 1994, at 32.

In spite of all this, Defendant cites some support to the contrary. None of this, however, comes from case law. Instead, Defendant relies solely on "more recent" and "more thoroughly reasoned" state ethics opinions to argue that surreptitious taping is not unethical. *See* Oregon State Bar Assoc., Formal Op. 1999-156 (1999); Utah State Bar Ethics Advisory Op. Comm., Op. 96-04; Oklahoma Bar Assoc. Legal Ethics Comm., Op. 307 (1994); New York County Lawyers' Assoc. Comm. on Prof'l Ethics, Op. 696 (1993). Our own review of case law, however, discovered cases from Mississippi embracing Defendants' position. *See, e.g., Attorney M v. Miss. Bar*, 621 So.2d 220, 223-24 (Miss. 1992).

After careful review of everything that has been presented, and much more, we side with the majority -- the best-reasoned approach: an attorney who surreptitiously records conversations with witnesses in civil cases engages in inherently deceitful conduct in violation of Local Rule 83.58.4(a)(4). Accordingly, Defendants' counsel has acted unethically in this regard in this litigation.

People who speak to attorneys in civil cases reasonably expect that they are not being recorded.[4] The legal community

---

[4] As this sentence expressly indicates, people's expectation when speaking to attorneys in criminal cases is
(continued...)

fosters and protects this expectation; as it should because of the unique position attorneys hold in society as officers of the court. In this capacity, attorneys, like judges, are "bound to work for the advancement of justice." *Hickman*, 329 U.S. at 510.

Whether justice is advanced depends on public confidence in the legal system. Public confidence in the legal system, of course, depends on public confidence in the legal profession. Indeed, this is why the legal profession holds itself out to the public as adhering to the highest possible ethical standards. The qualities of fairness and integrity are thereby attributed to the legal system.

Public perception of the integrity of attorneys, as portrayed by the legal profession, also affects people's desire to speak openly with attorneys. Because open discussion is, without question, vital to the advancement of justice, only conduct that positively reflects the integrity of attorneys should be tolerated. Accordingly, attorney conduct, including during conversations with lay people, should personify fairness and honesty.

At a minimum, fairness and honesty require attorneys to disclose material facts to witnesses at the commencement of a conversation. *See In re an Anonymous Member of the S.C. Bar*, 322 S.E.2d 667, 669 (S.C. 1984) (attorney acted unethically by

---

[4](...continued)
beyond the scope of this opinion. Public policy considerations, not present here, are implicated in such circumstances. *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 337.

failing to identify himself as an attorney); Utah State Bar
Ethics Advisory Op. Comm., Op. 96-04. Whether a conversation is
being recorded is a material fact, just like whether the speaker
is an attorney is a material fact. People may speak differently
when their conversations are being recorded. Or, they may decide
not to speak at all. Indeed, there would be no reason for an
attorney to surreptitiously record a conversation unless he
believed that disclosure would affect the substance of the
conversation.

Not disclosing the material fact that a conversation is
being taped, and thereby endeavoring to foreclose a person's
choice to speak "on the record" without actually providing the
person with information to intelligently exercise that choice is
therefore inherently deceitful because the practice obtains
information through trickery. Trickery injures public confidence
in the legal profession and thereby the legal system, for the
reasons explained above. Simply put, such tactics are not
becoming of an officer of the court.

This entire analysis is nothing new. More or less, this
same line of reasoning permeates all of the authorities following
the majority position on surreptitious taping by attorneys.

An application of the foregoing to the facts of this case
provides an illustration. Upon receiving Defendants' counsel's
subpoena, Dippold voluntarily called Defendants' counsel and
"indicated his willingness to answer any questions that were
asked of him." (Greenwald Decl. at 2.) The circumstances

surrounding the call indicate that Dippold believed he was about to participate in an easygoing, off-the-record discussion with Defendants' counsel. Defendants' counsel's immediate informal "hi" and assurance that he only wanted to make things "as easy as possible for everybody" confirm this belief. (*Id.* Ex. C. at 2.)

But the next fifty-two pages of dialogue can hardly be described as a cordial chat. Defendants' counsel steered the conversation by eliciting particular responses to detailed questions. Even those particular responses led to more detailed questions. Ostensibly, Defendants' counsel's goal was to lure Dippold into making a damning statement that Defendants' counsel could use against Dippold at a later date.

Defendants' counsel evidently believes he elicited such damning statements, which of course is the reason why the transcript of the tape was used against Dippold at the deposition. No doubt Dippold will think twice next time he speaks to an attorney. And no doubt Dippold thinks differently about the adversary system because of the underhanded tactics engaged in by Defendants' counsel, an officer of the court.

Sure, all Dippold had to do was ask. But this begs the question. Defendants' counsel is the one who holds himself out as adhering to the highest possible ethical standards as an officer of the court. It would be perverse to force Dippold to anticipate deceit and to burden Dippold with uncovering Defendants' counsel's deceitful tactics.

Along these same lines, we reject what Defendants refer to as the "more recent" and "more thoroughly reasoned" ethics opinions. The "more recent" label can quickly be dismissed: the majority position brandishes ethics opinions from 1996, which happens to be "more recent" than some of those on which Defendants rely. But numbers alone bear little significance.

More important, the "more thoroughly reasoned" label is untenable. The minority position places too much emphasis on technology and not enough emphasis on the role of attorneys as officers of the court.

The thrust of the minority position is that people's expectation of privacy has lessened as technology has advanced. Because the majority position fails to sufficiently consider the effect of new technology on people's expectations, the argument goes, the majority position is outdated and obsolete.

To follow the minority's position one would have to agree with the absurd proposition that people's understanding of right and wrong should change with technology. Stanley Arkin, who Defendants quote to support their position, actually alludes to this in an article. After commenting on recent advancements in technology and how people are increasingly subject to monitoring, Arkin warns: "The condonation to tape record in secret appears, however, to be an invitation for attorney mischief. Secret tape recording provides opportunities for the unscrupulous attorney to take advantage of . . . friendly witnesses . . . ." Arkin, *supra*, at 3. Arkin concludes: "Not only does secret

tape-recording by attorneys undermine traditional notions of lawyering and professionalism that are the key to our rules of ethics, it can lead a lawyer and client into criminal waters." *See id.* Arkin makes a poor choice as spokesperson of the minority position.

Or as another commentator remarks: "To be sure, secretly recording a telephone conversation may be as easy as stealing candy from a baby. But it hardly follows . . . that such conduct is forthright and ethical merely because it is simple to effectuate." Schwartz, *supra*, at 32.

Even assuming the expectations of the public vis-a-vis each other have changed because of technological advancements, it must always be remembered that attorneys are held to a higher standard. *See In re Hunter Studios, Inc.*, 164 B.R. at 438-39 (emphasizing the different ethical standards applicable to attorneys and nonattorneys in the context of surreptitious taping). As explained above, the legal profession's repeated announcement of this higher ethical standard creates different expectations of fairness and honesty than the public expects from others, notwithstanding any changes in technology. The attorney ethical code is not so whimsical.[5] A failure to adequately

---

[5] Incidentally, this argument based on advancements in technology is nothing new. This is the same argument that served as the impetus for the ABA's 1974 opinion. *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 337 ("Recent technical progress in the design and manufacture of sophisticated electronic recording equipment and revelations of the extent to
(continued...)

address this important distinction between attorney conduct and nonattorney conduct requires us to set aside the minority position.

Finally, with regard to the minority's position that ABA Formal Opinion 337 is poorly reasoned, we proffer that the basis for that opinion can be easily understood by reviewing the formal and informal opinions cited in it. All of those opinions lead to the following conclusion: surreptitious taping of conversations by attorneys in civil cases is inherently deceitful. On this point the federal courts agree.

In sum, because we agree that Defendants' counsel engaged in unethical conduct by surreptitiously taping conversations with witnesses, any work-product protection that otherwise may have existed is vitiated and Defendants' tapes must be disclosed to Plaintiff.

### b. Local Rule 83.54.4

Notwithstanding the above, Plaintiff also argues that Local Rule 83.54.4 provides an independent basis for vitiating the work-product doctrine in this case. Local Rule 83.54.4 proclaims that, while representing a client, "a lawyer shall not use . . . methods of obtaining evidence that violate the legal rights of [another] person." By expressly referencing the rights of others, the Rule imposes one of many necessary ethical limits on

---

[5](...continued)
which such equipment has been used . . . make it desirable to issue a Formal Opinion as to the ethical questions involved.").

zealous representation. Whether a violation of the Rule occurs, of course, requires the application of substantive law.

In Illinois, a person violates the rights of another person by recording a telephone conversation without the consent of that other person. *See People v. Siwek*, 671 N.E.2d 358, 363 (Ill. App. Ct. 1996). Such conduct is expressly prohibited by the Illinois eavesdropping statute. *See id.* (recognizing that the 1994 amendment to the statute "extended the coverage of the eavesdropping statute to all conversations, regardless of whether [the conversations] were intended to be private"); *see also Archer Daniels Midland Co. v. Whitacre*, 60 F. Supp. 2d 819, 830-31 (C.D. Ill. 1999) (same). The statute not only imposes criminal penalties, but also provides individuals who are surreptitiously taped with a private cause of action. *See* 720 ILCS 5/14-2, 6.

A plain reading of Local Rule 83.54.4 coupled with the Illinois eavesdropping statute leads us to believe that Defendants' counsel engaged in unethical behavior by taping witnesses present in Illinois, even though Defendants' counsel was in New York at the time of taping. *Cf. Thomas v. Pearl*, 793 F. Supp. 838, 844-45 (C.D. Ill. 1992) (refraining from addressing the issue whether out-of-state defendants can violate the statute by taping Illinois residents). First, with respect to the Illinois eavesdropping statute, Defendants' counsel's transgression of the statute is straightforward. This litigation

is taking place in Illinois. Defendants' counsel entered

Illinois and for purposes of this litigation asked to receive the

same benefits and privileges as an Illinois attorney.

Defendants' counsel then had subpoenas issued from this federal

court in Illinois served on Dippold and Sigel in Illinois.

Dippold and Sigel subsequently contacted Defendants' counsel from

Illinois as a result of receiving those subpoenas, and

Defendants' counsel surreptitiously taped the ensuing

conversation. Considering all of these significant contacts, the

mere fact that Defendants' counsel's recorder was located in New

York offers no solace.

That being said, application of Local Rule 83.54.4 is

elementary. Defendants' counsel violated the rights of Dippold

and Sigel by surreptitiously recording them, and therefore

Defendants' counsel engaged in unethical behavior.

This result should not come as a surprise.[6] It is axiomatic

that Defendants' counsel, as a pro hac vice admittee, must

faithfully adhere to this Court's ethical rules. *See United*

---

[6] Defendants present no real argument on this issue.
Admittedly, Defendants pointed out at oral argument that New York
law permits surreptitious taping while Illinois law does not, and
that Defendants' counsel taped the conversations from New York,
but these facts alone raise no defense. Perhaps if Defendants
had developed this argument and cited some authority, we would
have a more difficult determination. *See United States v. South*,
28 F.3d 619, 629 (7th Cir. 1994) (placing the burden on the party
making the argument to sufficiently develop the argument); *United
States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)
("[P]erfunctory and undeveloped arguments, and arguments that are
unsupported by pertinent authority, are waived.").

*States v. Collins*, 920 F.2d 619, 626 (10th Cir. 1990). This

includes the self-contained rules, *see* Local R. 83.51.1

(competence), and those rules that are intrinsically bound to and

necessarily require the consideration of substantive law. *See*

Local R. 83.54.4 (respect for the rights of third persons). In

this regard, by agreeing to faithfully comply with this

district's ethical rules, Defendants' counsel agreed to become

familiar with and abide by this district's substantive law,

whether that be state or federal law.

This result makes sense. It seems clear that an Illinois

attorney in Illinois cannot surreptitiously tape an Illinois

resident without violating the law. Certainly that same Illinois

attorney could not avoid application of the eavesdropping statute

simply by setting up another office, say, in Indiana or Iowa, and

then engaging in the same conduct from there. Similarly, for the

same reason, it is equally clear that Defendants' counsel, which

for purposes of this litigation is deemed a regularly admitted

Illinois attorney, cannot avoid application of the eavesdropping

statute simply by engaging in surreptitious taping from New York.

The ethical rules serve many beneficial purposes, one of

which is to maintain a level playing field between regularly

admitted attorneys and those admitted pro hac vice. If all

attorneys are to receive the same benefits and privileges of

practicing before this Court, then all attorneys must be held to

the same professional responsibilities and ethical standards.

Otherwise, the system would become patently unfair and sharp practices would inevitably develop as regularly admitted attorneys desperately scoured for ways to achieve equality with their pro hac vice counterparts.

In sum, because Defendants' counsel violated the Illinois eavesdropping statute and thereby transgressed Local Rule 83.54.4 by violating the rights of third persons, any work-product protection that would have otherwise applied to the tapes is vitiated. On this ground alone, the tapes should be turned over to Plaintiff.

### D.   Protective Order and Attorney's Fees

We deal summarily with the final two issues raised by Plaintiff. First, pursuant to Rule 26(c), we grant Plaintiff's request for a protective order. *See* Fed. R. Civ. P. 26(c). For the remainder of this litigation, Defendants' counsel is prohibited from recording any conversation, whether by tapes or other electronic device, without the consent or prior knowledge of all parties to the conversation. Plaintiff has adequately demonstrated that a protective order is necessary to protect third persons.

To the contrary, Plaintiff's request for attorney's fees and other expenses in bringing this motion is denied because Defendants' position was substantially justified. *See* Fed. R. Civ. P. 37(a)(4). Defendants may not have prevailed but

each of the arguments they presented had a reasonable basis in law and fact. *Cf. Jones*, 1989 WL 152352, at *5 (finding party's position not substantially justified).

### III.  <u>Conclusion</u>

For the foregoing reasons, Plaintiff's Motion to Compel is granted in part and denied in part, and Plaintiff's Motion for a Protective Order is granted, all as stated above.

**ENTER ORDER:**

**Dated:**  April 20, 2001.

**MARTIN C. ASHMAN**
United States Magistrate Judge

Copies have been mailed to:

MARY ROSE ALEXANDER, Esq.
STEPHEN A. SWEDLOW, Esq.
AMY J. KAPPELER, Esq.
KATHERINE D. VEGA, Esq.
Latham & Watkins
233 South Wacker Drive
Suite 5800
Chicago, IL  60606

NANCY CHANG, Esq.
WILLIAM H. GOODMAN, Esq.
Center for Constitutional
  Rights
666 Broadway
7th Floor
New York, NY  10012

JANINE L. HOFT, Esq.
People's Law Office
1180 North Milwaukee Avenue
Chicago, IL  60622

Attorneys for Plaintiff

GLENN GREENWALD, Esq.
Greenwald, Christoph
  & Holland, P.C.
1370 Avenue of the Americas
32nd Floor
New York, NY  10019

Attorneys for Defendants